UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOHO HOTEL OWNER, LLC,<br><br>　　　　　Plaintiff,<br><br>　　　-v-<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION and KELLY LOEFFLER, Administrator of the United States Small Business Administration,<br><br>　　　　　Defendants. | 25-cv-2838 (JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

During the early days of the COVID-19 pandemic, Congress established the Paycheck Protection Program ("PPP") to aid small businesses impacted by the pandemic's economic fallout. The Program's purpose was to provide forgivable loans to small businesses to cover payroll and other qualifying expenses. As part of its responsibility for administering the PPP, the United States Small Business Administration ("SBA") promulgated rules to govern businesses' eligibility for such loans. Plaintiff Soho Hotel Owner, LLC ("Soho Hotel") challenges one such rule, the so-called Corporate Group Rule, and its application to Soho Hotel, in connection with SBA's denial of Soho Hotel's loan forgiveness application.

Before the Court are the parties' cross-motions for summary judgment. After receiving the parties' submissions and holding argument on the motions, the Court, by bottom-line order, granted defendants' motion for summary judgment in full. This Opinion and

1

Order sets forth the reasons for that decision and directs the entry of final judgment.

## I.    Background and Procedural History

### A. Statutory and Regulatory Framework

In March 2020, to address the economic disruption caused by the COVID-19 pandemic, Congress passed the CARES Act, Pub L. No. 116-136, 134 Stat. 281 (2020). Among other things, the CARES Act established the Paycheck Protection Program ("PPP"), which guaranteed emergency loans to small businesses affected by the pandemic. See CARES Act § 1102, 134 Stat. at 286-94 (codified at 15 U.S.C. § 636(a)). PPP loans are eligible for forgiveness so long as the borrower is an eligible small business and uses the funds for payroll costs and other allowable expenses. See 15 U.S.C. §§ 636(a)(36)(F), 636m. To obtain forgiveness, a borrower must submit a forgiveness application to the lender. If the lender determines that the loan is eligible for forgiveness, it then submits a request for payment to the SBA. 15 U.S.C. § 636m(g).

Congress initially authorized $349 billion in loan commitments for the PPP in March 2020, followed by an additional $310 billion one month later. See CARES Act § 1102(b), 134 Stat. at 293; Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620, 620 (2020). Together, these amounts funded so-called "first draw" PPP loans.

In December 2020, Congress, in the Economic Aid Act, authorized an additional $147.45 billion in so-called "second draw" PPP loans,

which were available to eligible businesses that had previously received "first draw" loans. See Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 311, 134 Stat. 1182, 2001-07 (2020).

Rather than build the PPP entirely from scratch, Congress placed responsibility for administering the Program with the Small Business Administration and situated it within SBA's preexisting business loan program, also known as the Section 7(a) loan program. See Pharaohs GC, Inc. v. United States Small Bus. Admin., 990 F.3d 217, 226-27 (2d Cir. 2021). By doing so, Congress extended to the PPP "existing [Section 7(a)] conditions and regulations, as well as existing SBA authority." Id. (quoting In re Gateway Radiology Consultants, P.A., 983 F.3d 1239, 1256 (11th Cir. 2020); see also 15 U.S.C. § 636(a)(36)(B) ("Except as otherwise provided . . . the [SBA] may guarantee [PPP] loans under the same terms, conditions, and processes as a loan made under [Section 7(a)].").

Under Section 7(a) of the Small Business Act, SBA may guarantee loans to small businesses that meet certain eligibility criteria, subject to limitations on loan amounts and the purposes for which the loans are used. See generally 15 U.S.C. § 636(a). Among other criteria, Section 7(a) loans are limited to businesses that qualify as "small business[es]" under the Act. See 15 U.S.C. § 632. Those size standards, which differ by industry, are regulated by SBA and depend on factors such as a business's number of employees and its annual receipts. Id. § 632(a)(2); see also 13 C.F.R. §§ 121.101-121.305 (setting forth size standards). Ordinarily, when measuring a business's size, SBA

3

considers the size of the business inclusive of its "affiliates." See 13 C.F.R. § 121.103(6).

Although the CARES Act adopted much of this framework for the PPP, it also detailed certain ways in which eligibility for PPP loans would differ from other Section 7(a) loans. See 15 U.S.C. § 636(a)(36)(D)-(W). As relevant here, for first-draw PPP loans the CARES Act included several provisions related to a business's size:

First, the Act made any business with up to 500 employees eligible for a PPP loan. Id. § 636(a)(36)(D)(i)(I). For businesses in industries whose Section 7(a) size standards were less than 500 employees, this represented an increase in eligibility relative to the Section 7(a) program.[1]

Second, with respect to the size of businesses in the hospitality industry, Congress waived application of SBA's so-called "affiliation rules" (the "Affiliation Waiver").[2] Id. § 636(a)(36)(D)(iv)(I). These rules typically required SBA to account for a business's "affiliates" when determining that business's size. See 13 C.F.R. § 121.103.

---

[1] For businesses in industries in which the size limit for Section 7(a) loans exceeded 500 employees, that higher limit extended to PPP loans, as well. 15 U.S.C. § 636(a)(36)(D)(i)(II). Only the 500-employee limit is relevant in this case.

[2] Specifically, the Act waived the affiliation rules for "any business concern with not more than 500 employees that . . . is assigned a North American Industry Classification System code beginning with 72." 15 U.S.C. § 636(a)(36)(D)(iv)(I). The parties agree that this includes hotels and restaurants, such as Soho Hotel.

It should also be noted that Congress increased the maximum disbursable loan amount from $5 million to "the lesser of" $10 million or an amount calculated based on the recipient's payroll costs. 15 U.S.C. § 636(a)(36)(E).

When Congress later authorized second-draw PPP loans, it made them subject to the "same terms, conditions, and processes" as first-draw loans, albeit with slightly more restrictive size limitations and a lower maximum loan amount. 15 U.S.C. § 636(a)(37)(B). Businesses were eligible for second-draw PPP loans so long as they had no more 300 employees (down from the 500-employee maximum established for first-draw loans). Id. § 636(a)(37)(A)(iv)(I)(aa). Second-draw loans were also subject to a maximum disbursable loan amount of $2 million (down from the $10 million maximum for first-draw loans). Id. § 636(a)(37)(C).

Congress also gave the SBA emergency rulemaking authority, relieving it of the typical notice-and-comment requirement. See 15 U.S.C. § 9012 (first-draw loans); Consolidated Appropriations Act, 2021, § 303, 134 Stat. at 1993 (second-draw loans). With respect to first-draw loans, Congress directed SBA to issue implementing regulations within 15 days of the enactment of the CARES Act on March 27, 2020. 15 U.S.C. § 9012. Congress again gave SBA emergency rulemaking authority in connection with second-draw loans, directing the agency to issue implementing regulations "[n]ot later than 10 days after" the enactment of the Economic Aid Act on December 27, 2020. Consolidated Appropriations Act, 2021, § 303, 134 Stat. at 1993. In

5

both instances, SBA issued implementing regulations, albeit somewhat past the deadlines specified by statute. See Business Loan Temporary Changes, 85 Fed. Reg. 26,324 (May 4, 2020); Business Loan Program Temporary Changes, 86 Fed. Reg. 3712 (Jan. 14, 2021).

One such regulation is at issue in this case. On May 4, 2020, in connection with the first-draw PPP loans, SBA promulgated the so-called "Corporate Group Rule." See 85 Fed. Reg. at 26,325. The Rule imposed a $20 million aggregate limit on the total amount in first-draw PPP loans that could be received by "businesses that are part of a single corporate group." Id. This limit applied in addition to the $10 million limit on individual loan disbursements imposed by statute. 15 U.S.C. § 636(a)(36)(E). The Rule defined a "single corporate group" to comprise any businesses that are "majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. at 26,325. It also expressly noted that the $20 million aggregate limit applied to any applicant for a PPP loan, even if the CARES Act had waived the SBA's affiliation rules for that type of business and regardless of whether the other businesses in the corporate group would or would not have qualified as "affiliates" under those rules. Id. SBA warned that borrowers were responsible for ensuring compliance with the Corporate Group Rule and that loans received in violation of its terms would "not be eligible for forgiveness." Id.

In adopting the Rule, SBA explained that its purpose was to "preserve the limited resources available to the PPP program." Id. It pointed specifically to the "previous lapse of PPP appropriations and

6

the high demand for PPP loans." Id.; see also Lisa Desjerdins, It Took 13 Days for the Paycheck Protection Program to Run Out of Money, PBS News (Apr. 16, 2020). SBA explained that limiting the total amount in PPP loans that a single corporate group could receive would "promote the availability of PPP loans to the largest possible number of borrowers" while "striking an appropriate balance" between the Program's limited funds and Congress's aim of providing broad relief. Id.

When Congress provided for second-draw PPP loans in December 2020 and again directed SBA to issue implementing regulations, SBA reissued many of the same regulations that had governed first-draw PPP loans, including the Corporate Group Rule. See 86 Fed. Reg. at 3716, 3720. For second-draw loans, which were subject to a statutory maximum of $2 million per individual disbursement (rather than $10 million), SBA limited businesses in a single corporate group to a maximum aggregate loan amount of $4 million (rather than $20 million). See id. at 3716, 3720; 15 U.S.C. § 636(a)(37)(C). SBA adopted the same definition of a "corporate group" and provided the same justifications for adopting the Rule as it had in connection with first-draw loans. 86 Fed. Reg. at 3716, 3720.[3]

_____

[3] The second-draw rule incorporated the definition of "corporate group" from the "Consolidated First Draw PPP [Interim Final Rule]." 86 Fed. Reg. at 3713 n.1; see also Business Loan Program Temporary Changes, 86 Fed. Reg. 3692 (Jan. 14, 2021) ("Consolidated First Draw PPP IFR"). That interim final rule, which SBA issued concurrently with the Second Draw rule, "restated existing regulatory provisions [applicable to first-draw loans] to provide lenders and new PPP

7

B. <u>Procedural History</u>

This case concerns plaintiff Soho Hotel's second-draw PPP loan. Soho Hotel is a Delaware company that owns 11 Howard, a hotel located in New York City. Rule 56.1 Statement ¶ 1, ECF No. 17. Soho Hotel is in turn owned by two individuals, Aby Rosen and Michael Fuchs, each of whom holds a 50 percent ownership interest in the company. <u>Id.</u> ¶ 2.

On March 16, 2021, Soho Hotel applied for a second-draw PPP loan.[4] <u>Id.</u> ¶ 6. Its application was approved by the lender and a loan was disbursed in the amount of $2 million on April 12, 2021. <u>Id.</u> ¶ 7. Soho Hotel applied for forgiveness of the loan on June 21, 2022, and its lender approved the application on November 21, 2022. <u>Id.</u> ¶ 8.

After conducting its own review, on December 13, 2023, SBA denied the request for forgiveness. SBA explained that the "corporate group" of which Soho Hotel is a part had received over $12 million in second-draw PPP loans, which "exceeds the maximum Second Draw allowable amount of [$4 million]." <u>Id.</u> ¶ 9 (quoting AR 31 ("First Denial"), ECF No. 14-2). Soho Hotel appealed the denial, but the appeal was dismissed (without prejudice) when SBA withdrew its loan decision (so as to reconsider the matter). <u>Id.</u> ¶¶ 10-12.

On September 19, 2024, SBA again denied Soho Hotel's application for loan forgiveness. <u>Id.</u> ¶¶ 13; <u>see also</u> AR 29-31 ("Second Denial"),

_____

borrowers a single regulation to consult . . . for First Draw PPP loans." 86 Fed. Reg. at 3713 n.1.

[4] Soho Hotel's first-draw PPP loan is not at issue in this case.

ECF No. 14-2. The agency provided substantially the same explanation as it did in the First Denial. The denial letter stated, in pertinent part:

> After a review of the documentation provided, the SBA concludes that the Borrower business[,] which is part of a corporate group[,] has received more than $4,000,000 of 2nd draw PPP loans in the aggregate.
>
> It is verified [that] the borrower, Soho Hotel Owner LLC, is 100% owned by Aby Rosen and Michael Fuchs. In addition, the borrower is part of [a] single corporate group having a combined majority ownership by Aby Rosen and Michael Fuchs.
>
> Per borrower-submitted [documentation], it is confirmed that Aby Rosen and Michael Fuchs, through direct and indirect ownership, are the combined majority owners of at least six entities which received second draw PPP loans totaling $10,680,496. The combined ownership by those two individuals in each entity within the corporate group results in majority ownership of each of those entities.
>
> . . . .
>
> Per the submitted loan application . . . the Borrower applied for this loan on March 16, 2021, which is after the corporate group received the maximum allowable amount of second draw PPP funds on or around February 11, 2021. Therefore, it is verified that Borrower was not eligible to receive this PPP loan and subsequently is not eligible for forgiveness.

Second Denial at 2-3.

Once more, Soho Hotel appealed the denial of its loan forgiveness application to the Office of Hearings and Appeals ("OHA"). Rule 56.1 Statement ¶ 18. On January 3, 2025, OHA issued a final decision denying the appeal. Id. ¶ 20; see also ECF No. 14-1 ("SBA OHA Decision"). OHA explained that Soho Hotel "has acknowledged that three other LLCs having direct or indirect ownership by Aby Rosen and Michael Fuchs had Second Draw PPP loans funded before March 16, 2021" -- the date on which Soho Hotel's loan application was submitted -- and that the

total amounts received by those businesses exceeded the $4 million corporate group limit. SBA OHA Decisions at 25-26. Therefore, "no other business in the same corporate group, including [Soho Hotel]," was eligible to receive additional second draw PPP loans after the $4 million aggregate limit had already been reached. Id. at 26. Soho Hotel's second-draw PPP loan therefore was not eligible for forgiveness.

On April 4, 2025, Soho Hotel filed in this Court the instant complaint and petition for judicial review of OHA's order, naming SBA and Kelly Loeffler, its Administrator, as defendants. The complaint asserted that SBA's refusal to forgive Soho Hotel's second-draw PPP loan violated the APA because (1) the Corporate Group Rule was in excess of statutory authority and contrary to law; (2) the agency had failed to follow notice-and-comment rulemaking procedures in promulgating the Corporate Group Rule; and (3) the Corporate Group Rule was improperly applied to Soho Hotel. See Compl. ¶¶ 57-98, ECF No. 1. Soho Hotel sought an order setting aside the challenged rule, reversing OHA's decision, and directing SBA to forgive its second draw PPP loan in its entirety. Id. at 18. Soho Hotel also sought a declaratory judgment. Id. ¶¶ 99-104.

The parties proceeded directly to summary judgment. Soho Hotel and the agency defendants each filed cross-motions for summary judgment. After considering the motions and hearing argument, the Court granted summary judgment to the defendants by bottom-line order. The Court now sets forth the reasons for that decision.

## II.   Standard of Review

"[T]he usual Rule 56 summary judgment standard 'does not apply'" in cases involving judicial review of a final agency action under the APA. New York v. U.S. Dep't of Health & Hum Servs., 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (quoting Ass'n of Proprietary Colls. v. Duncan, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015)). Instead, "'the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'" Koopmann v. U.S. Dep't of Transp., 335 F. Supp. 3d 556, 560 (S.D.N.Y. 2018) (quoting Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2011)). The court's role is to "decid[e], as a matter of law, whether the [challenged] agency action is . . . consistent with the APA standard of review." Fisher v. Pension Guard. Corp., 468 F. Supp. 3d 7, 18 (D.D.C. 2020); see also Estes v. U.S. Dep't of the Treasury, 219 F. Supp. 3d 17, 27 (D.D.C. 2016) ("When an agency action is challenged under the APA, summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the relevant APA standard of review."). In making this decision, the district court is generally confined to the administrative record as it was compiled before the agency. Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997).

## III.   Discussion

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious," "contrary to constitutional right," "in

11

excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706.

When reviewing agency action presents a question of law, the APA requires courts "to exercise their independent judgment in deciding whether [the] agency has acted within its statutory authority." Loper Bright Enters. V. Raimondo, 603 U.S. 369, 391 (2024); see also Env't Def. Fund v. U.S. Env't Prot. Agency, 124 F.4th 1, 11 (D.C. Cir. 2024) (court must "'apply[] all relevant interpretive tools' to reach 'the best reading of the statute'" (quoting Loper Bright, 603 U.S. at 394)).

Agency action that is not "contrary to law" must still be "reasonable and reasonably explained" and must rest on "consideration of the relevant factors." Fed. Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). It is arbitrary and capricious for an agency to rely on factors which Congress did not intend it to consider or to fail to consider an important aspect of the problem. Solondz v. Fed. Aviation Admin., 141 F.4th 268, 276 (D.C. Cir. 2025).

"Because it 'is axiomatic . . . that an agency is bound by its own regulations,'" courts must likewise set aside agency action that "flout[s] the agency's own regulations." Blue Cross & Blue Shield of Mass., Inc. v. Kennedy, 808 F. Supp. 3d 139, 144-45 (D.D.C. 2025).

Here, Soho Hotel principally argues that SBA's denial of its loan forgiveness application should be set aside because the rule on which that denial was based was contrary to law, promulgated in excess of statutory authority, and wrongly applied to plaintiff. Defendants disagree and urge the Court to grant summary judgment in their favor.

12

For the reasons set forth below, the Court grants summary judgment to defendants.

A. **The Corporate Group Rule Is Not Contrary to Law**

Soho Hotel first argues that the Corporate Group Rule is contrary to law because it conflicts with the Affiliation Waiver contained in the CARES Act and in the Economic Aid Act. SBA argues there is no conflict. To resolve this issue, we "start with the text." Linza v. Saul, 990 F.3d 243, 248 (2d Cir. 2021).

As noted above, Congress in the CARES Act provided that "the provisions applicable to affiliations under [13 C.F.R. § 121.103] . . . are waived with respect to eligibility for a [first-draw PPP] loan for," among other businesses, "any business concern with not more than 500 employees" that operates in the hospitality industry. 15 U.S.C. § 636(a)(36)(D)(iv). Congress later applied this "waiver" to second-draw PPP loans as well. 15 U.S.C. § 636(a)(37)(E).

This so-called "Affiliation Waiver" is straightforward. It waives application of SBA's affiliation rules to small businesses in the hospitality industry seeking PPP loans. SBA's affiliation rules, set forth at 13 C.F.R. § 121.103, in turn, provide that, "[i]n determining [a business's] size, SBA counts the receipts, employees, or other measure of size of the [business] whose size is at issue and all of its domestic and foreign affiliates." 13 C.F.R. § 121.103(a)(6) (emphasis added). The affiliation rules also provide guiding

13

principles for determining whether businesses are indeed "affiliates." See generally id. § 121.103.

The affiliation rules, however, concern only the proper methodology for determining a business's size. Thus, by waiving these rules for hospitality-industry businesses, Congress determined that, for purposes of PPP loans, the number of employees, receipts, or other measures of size of a business's affiliates should play no role in calculating that business's size. Size, in turn, is relevant specifically to determining whether a business has 500 employees or fewer and is therefore "eligible to receive a [PPP] loan." see 15 U.S.C. § 636(a)(36)(D)(i)(I). As a result of the Affiliation Waiver, only a business's own employees, and not those of its "domestic and foreign affiliates," may be counted for this purpose. 13 C.F.R. § 121.103(a)(6).

The Corporate Group Rule does not alter this. Unlike the Affiliation Waiver, the Corporate Group Rule has nothing to do with whether a business is size-eligible for a PPP loan. The Corporate Group Rule is instead concerned with the amount of PPP loan funds that an otherwise eligible business can receive. The Rule supplements Congress's individual limit by placing an aggregate limit on the total amount in PPP loans that may be received by otherwise eligible businesses that are part of the same corporate group.

There is no conflict between this and the Affiliation Waiver. Limiting the total funds that may be received by an otherwise eligible business is a different enterprise than determining whether that

14

business is, by virtue of its size, eligible for a PPP loan in the first place. Indeed, in both the CARES Act and the Economic Aid Act, Congress itself imposed limits on individual loan amounts separate from and in addition to limiting the size of eligible businesses. See 15 U.S.C. § 636(a)(36)(E), (37)(C).

Take Soho Hotel as an example. Absent the Affiliation Waiver, if Soho Hotel and the five other businesses SBA identified as part of the same corporate group had, in total, more than 300 employees (and likewise qualified as "affiliates"), none of those businesses would have been eligible to receive any amount in second-draw PPP loans. By directing the agency not to count the number of employees at affiliates, however, the Affiliation Waiver guaranteed that each of the affiliated businesses, including Soho Hotel, was eligible for a second-draw PPP loan. The Corporate Group Rule, by contrast, affected only the total amount of funds that Soho Hotel and the other five businesses could receive in the aggregate. No individual business was disqualified based on its or any of the other businesses' size.

Soho Hotel's contrary arguments are unavailing. First, to the extent that Soho Hotel faults the Corporate Group Rule for taking into account, in any manner, the association between businesses, it rests on an untenable interpretation of the Affiliation Waiver. Nowhere in either the CARES Act or the Economic Aid Act did Congress prohibit SBA from taking into account, for any purpose, businesses' common ownership. The Affiliation Waiver narrowly addresses the affiliation

rules set forth at 13 C.F.R. § 121.103. It says nothing about the consideration of a business's "affiliations" for any other purpose.

Second, Soho Hotel makes much of the fact that, as a result of the Corporate Group Rule, SBA determined that it was not "eligible" for the second-draw PPP loan it had received. SBA OHA Decision at 26. However, this, too, does not demonstrate a conflict between the Corporate Group Rule and any provision of either the CARES Act or the Economic Aid Act. Congress did not, in either statute (and certainly not in the Affiliation Waiver itself), guarantee that every "eligible entity" would receive any particular loan amount. Instead, Congress provided that SBA "may guarantee [PPP] loans to eligible entities," set only a maximum loan amount per "eligible entity," and supplied the Program with limited funds. See 15 U.S.C. § 636(a)(37)(B), (C) (second-draw PPP loans) (emphasis added); see also id. § 636(a)(36)(B), (E) (first-draw PPP loans). The most reasonable conclusion from this is that Congress set a ceiling on loan eligibility but did not guarantee any particular outcome. See also Pharaohs GC, 990 F.3d at 227 (affirming SBA's authority to adopt narrower eligibility criteria for PPP loans than those provided by Congress).

Moreover, Soho Hotel's ineligibility for any amount in second-draw PPP funds was in no way predetermined by the Corporate Group Rule. As noted above, the six businesses, including Soho Hotel, that SBA identified as belonging to a single corporate group, were eligible, collectively, to receive up to $4 million in second-draw PPP loans. Nothing in SBA's regulations prevented Soho Hotel and the other

16

businesses in the corporate group from each receiving a portion of that $4 million maximum.

Finally, if there were any remaining doubt about Congress's intent in enacting the Affiliation Waiver, Congress's decision not to disturb the Corporate Group Rule when establishing the second-draw PPP suggests that Congress took no issue with its promulgation. See Aetna Life Ins. Co. v. Big Y Foods, Inc., 52 F.4th 66, 75 (2d Cir. 2022) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (citation omitted)). Indeed, when Congress established the second-draw PPP, it expressly provided that second-draw loans would be subject to "the same terms, conditions, and processes as [first-draw] loan[s]." 15 U.S.C. § 636(a)(37(B). Even as Congress did undertake to modify certain other eligibility criteria (such as by reducing the employee cap for eligible businesses from 500 to 300 employees and reducing the maximum loan amount from $10 to $2 million), Congress did not disturb or displace the Corporate Group Rule. Had Congress wanted to clarify the scope of the Affiliation Waiver, it could have done so. But it did not. See 15 U.S.C. § 636(a)(37)(E)(i) (reapplying the Affiliation Waiver without change).

The Second Circuit's decision in Pharaohs GC, 990 F.3d 217, is instructive. There, the Second Circuit upheld the application of SBA's pre-existing prurience restriction to the PPP, despite Congress's silence on the matter. The Court reasoned that the PPP was enacted "on the foundation of the SBA's 7(a) loan program," which had historically

included certain regulatory limits on loan eligibility. Id. at 227. Congress's decision to expressly modify certain of those eligibility criteria without "similarly clarify[ing] its intent" to do away with the prurience restriction "strongly suggest[ed] that Congress deliberately chose not the change [SBA's] statutory discretion to exclude [such] businesses" from loan eligibility. Id. Similarly, Congress here enacted the second-draw PPP on the foundation of the first-draw Program. It made certain changes to eligibility criteria for second-draw loans, but did not clarify its intent to do away with the Corporate Group Rule. This is good evidence that Congress viewed the Rule as falling within SBA's rulemaking discretion.

**B. SBA Did Not Exceed Its Statutory Authority in Promulgating the Corporate Group Rule**

Soho Hotel argues that, even if the Corporate Group Rule does not violate the Affiliation Waiver, SBA nonetheless exceeded the bounds of its delegated authority in promulgating the Rule. Its arguments are not persuasive.

It is well-established that Congress may delegate to an agency the authority to "fill up the details" of a statutory scheme. See Loper Bright, 603 U.S. at 395. Here, Congress unquestionably placed responsibility for administering the PPP within SBA's existing section 7(a) authority and, in doing so, delegated to it broad power to "make such rules and regulations as [it] deems necessary to carry out the authority vested in it" and to "take any and all actions . . . when [it] determines such actions are necessary or desirable in making . . .

or otherwise dealing with or realizing on loans." 15 U.S.C. § 634(b)(6), (7); see also Small Bus. Admin. v. McClellan, 364 U.S. 446, 447 (1960) (characterizing SBA's section 7(a) authority as involving "extraordinarily broad powers"). This broad grant of rulemaking authority plainly vested the SBA with authority to "fill up the details" of the PPP loan program; indeed, Soho Hotel does not seriously question whether SBA had the authority to do so.

Soho Hotel does argue, however, that SBA exceeded whatever rulemaking authority it did have because it lacked authority to supplement the congressionally established eligibility criteria for PPP loans. Soho Hotel points to language in the Economic Aid Act that provides that "any business concern" that satisfies certain conditions is an "eligible entity" for the purposes of second-draw PPP loans. 15 U.S.C. § 637(a)(37)(A)(iv)(I); see also id. § 636(a)(36)(D)(i) ("any business concern" meeting certain criteria "shall be eligible to receive a [first-draw PPP] loan"). Soho Hotel contends that this provision is mandatory and that it therefore foreclosed SBA from promulgating any additional so-called "eligibility" criteria.

This contention is, however, unsupported by the statutory text and flatly foreclosed by the Second Circuit's decision in Pharaohs GC. First, the language of both the CARES Act and the Economic Aid Act is consistent with SBA's discretionary authority to guarantee PPP loans, subject to the agency's own rulemaking. In neither statute did Congress guarantee that every "eligible" entity would receive a loan or guarantee eligible entities any particular loan amount. Instead,

19

Congress provided that SBA "may guarantee [PPP] loans," 15 U.S.C. § 636(a)(36)(B), (37)(B) (emphasis added), using language that "clearly connotes discretion," Biden v. Texas, 597 U.S. 785, 802 (2022) (emphasis omitted); see also, e.g., In re Gateway Radiology Consultants, P.A., 983 F.3d at 1257) ("The use of the permissive word 'may' [in 15 U.S.C. § 636(a)(36)(B)] vests the SBA with discretionary authority [over PPP loan eligibility]."). This permissive grant, paired with the SBA's historically broad rulemaking authority, provides "ample authority" for SBA's adoption of the Corporate Group Rule, as just one of a number of so-called "eligibility" criteria. Accordius Health at Asheville, LLC v. United States Small Bus. Admin., No. 23-cv-00129-MR, 2025 WL 1503583, at *6 (W.D.N.C. Apr. 8, 2025); see also Forest View Rehab. & Nursing Ctr., LLC v. United States Small Bus. Admin., No. 24 CV 1490, 2024 WL 5247837, at *8 (N.D. Ill. Dec. 30, 2024) (upholding the Corporate Group Rule and noting that the term "may", as used in § 636(a)(36)(B), "underscore[s] the overall degree of discretion Congress granted the SBA to implement the PPP").

Second, as noted above, the Second Circuit has already expressly upheld SBA's authority to supplement the statutory eligibility criteria set forth in the CARES Act and the Economic Aid Act. In Pharaohs GC, the Court upheld an agency-promulgated restriction on PPP loan eligibility for businesses engaged in live performances of a "prurient sexual nature." 990 F.3d at 224 (quoting 13 C.F.R. § 120.110). In challenging that restriction, the plaintiff, like Soho Hotel here, relied on the section of the CARES Act providing that "any

20

business concern" that satisfies certain size criteria "shall be eligible to receive a [PPP] loan." Id. at 226 (quoting 15 U.S.C. § 636(a)(36)(D)(i)). The plaintiff argued that this provision left SBA with no discretion to categorically exclude certain types of businesses from the program because all businesses that meet the enumerated criteria must be eligible for a loan. The Second Circuit rejected this argument, concluding that the provision in question "simply rais[es] the employee threshold" for eligibility, but "does not require [SBA] to make eligible all businesses below that threshold." Id. at 227-28. In other words, the phrase "any business concern . . . shall be eligible" does not mean that "every business concern" will be eligible. Id. at 227.

Soho Hotel's argument fails for exactly the same reasons. As the Second Circuit explained in Pharaohs GC, SBA has discretionary authority to supplement Congress's eligibility criteria for PPP loans. Nothing in Congress's provision that "any business" meeting the statutory size criteria is an "eligible entity" takes away this discretion. 15 U.S.C. § 637(a)(37)(A)(iv)(I). Accordingly, even if the Corporate Group Rule -- which, unlike the prurience restriction challenged in Pharaohs GC, does not affect an entity's baseline eligibility for a loan -- were characterized as an "eligibility" criterion, it would still fall within the agency's discretion to promulgate.

In much the same vein, Soho Hotel argues that the Corporate Group Rule exceeds SBA's rulemaking authority because Congress adopted

21

specific formulas to govern the amount awarded in second-draw PPP loans and did not give SBA the authority to "revise the statute's formulas" through application of the Corporate Group Rule. Pl.'s SMJ Mem. at 12. But, once again, Soho Hotel overstates the statute's guarantees. Congress set the "<u>maximum</u> amount of a [second-draw PPP] loan" that may be awarded to an "eligible entity" at $2 million (or a payroll-based amount, if smaller). 15 U.S.C. § 636(a)(37)(C)(iv) (emphasis added); <u>see also</u> 15 U.S.C. § 636(a)(36)(E) (setting "maximum amount" of a first-draw PPP loan at $10 million, but no minimum). This sets only "a ceiling, but no floor" on the amount that an eligible business can receive in second-draw PPP loans. <u>Forest View Rehab. & Nursing Ctr.</u>, 2024 WL 5247837, at *8. The Corporate Group Rule does not "revise" this maximum. It merely imposes a second, higher ceiling on the total loan amount that may be received across a single corporate group.

Finally, Soho Hotel argues that the Corporate Group Rule is "incongruous" with the "statutory purposes and design" and therefore cannot stand. Pl.'s SMJ Mem. at 13 (quoting <u>Gonzalez v. Oregon</u>, 546 U.S. 243, 267 (2006)). But the very purposes that Soho Hotel points to are consistent with SBA's adoption of the Corporate Group Rule. As Soho Hotel notes, Congress's aim in creating the PPP was "to help businesses weather the pandemic," and, more specifically, "to provide support to as many displaced American workers as possible." <u>Id.</u> (first quoting <u>Air Excursions LLC v. Yellen</u>, 66 F.3th 272, 275 (D.C. Cir. 2023); and then quoting <u>DV Diamond Club of Flint, LLC v. SBA</u>, 960 F.3d

22

743, 746 (6th Cir. 2020)). The Corporate Group Rule, by capping the loan amount that may be awarded to businesses with common ownership, advanced these purposes. As the SBA explained when initially promulgating the Rule, its aim in doing so was to "preserve the limited resources available" given the "high demand for PPP" loans. 85 Fed. Reg. at 26,325; see also 86 Fed. Reg. at 3716, 3720 (justifying application of the Corporate Group Rule to second-draw PPP loans for the same reasons). Because demand for PPP loans readily outstripped supply -- as evidenced by, among other things, the fact that Congress's initial $349 billion appropriation was exhausted in under two weeks -- limiting the total amount that could be awarded to commonly owned businesses "promote[d] the availability of PPP loans to the largest possible number of borrowers," consistent with Congress's aims. 85 Fed. Reg. at 26,325.[5] The Corporate Group Rule was therefore a rational attempt to administer the PPP in a manner that would best serve Congress's goals of providing broad relief.[6]

---

[5] Soho Hotel argues that SBA's application of the Corporate Group Rule to businesses in the hospitality industry especially undercut Congress's aims in enacting the PPP. This is mistaken. To the extent that the hospitality industry suffered "the most significant disruption and heaviest losses of any industry during the pandemic," Pl.'s SMJ Mem. at 13, it would still undoubtedly be benefited by making loans available to the broadest number of businesses in that industry. Although concentrating relief among affiliated entities might have benefitted Soho Hotel, that is not evidence that it would have been to the benefit of the hospitality industry overall.

[6] At the end of its brief, Soho Hotel makes a last-ditch attempt to argue that the Corporate Group Rule is arbitrary and capricious because its adoption was based on factors that Congress did not intend for SBA to consider. In making this argument, Soho Hotel essentially recycles in truncated form the same reasons it advances for concluding

## C. **The Tardiness of SBA's Emergency Rulemaking Does Not Render It Invalid**

Soho Hotel also argues that the Corporate Group Rule is invalid because the SBA missed the congressionally imposed deadlines for emergency rulemaking under both the CARES Act and the Economic Aid Act. Because it failed to meet the statutory deadlines, Soho Hotel contends, SBA cannot rely on Congress's grant of emergency rulemaking power to excuse its failure to follow notice-and-comment procedures in promulgating the Corporate Group Rule.

The Supreme Court, however, has repeatedly rejected attempts to invalidate agency action based on an agency's failure to meet a deadline specified by statute. See Barnhart v. Peabody Coal Co., 537 U.S. 149, 158 (2003). As the Court has explained, unless the statute "specif[ies] a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanctions." Id. at 159. The mere fact that a statute provides that an agency "shall" act within a specified period does not, on its own, create a "jurisdictional limit precluding action later." Id. To the contrary, statutory deadlines for agency action are

_____

that the rule exceeds SBA's authority. These arguments do not carry the day for the same reasons just explained. Indeed, SBA's stated rationale for adopting the Corporate Group Rule -- to "preserve the limited resources available to the PPP program" and to "promote the availability of PPP loans to the largest possible number of borrowers" -- is well-reasoned, rationally related to the rule adopted, and consistent with Congress's aims, even as Soho Hotel conceives of them. See Pl.'s SMJ Mem. at 25 (Congress's "express intent" in creating PPP was to "keep workers employed" by increasing eligibility for loans).

24

generally understood to "spur [the agency] to action, not to limit the scope of [its] authority." Id. at 158. Thus, because the statutes here did not specify any consequence for SBA's failure to comply with the rulemaking deadline, it follow that, even if SBA's rulemaking were untimely, that is no basis for invaliding the resultant rules.

There is no added significance to the fact that the Corporate Group Rule was adopted, pursuant to Congress's grant of emergency rulemaking authority, without notice-and-comment. Soho Hotel does not dispute that the CARES Act and Economic Aid Act authorized SBA to issue regulations "without regard to [the APA's] notice requirements." 15 U.S.C. § 9012; see also Consolidated Appropriations Act, 2021, § 303, 134 Stat. at 1993. Soho Hotel contends, however, that the Corporate Group Rule could not have been issued pursuant to that grant of authority because the authority lapsed on the date specified by statute. But, as the Supreme Court explained in Barnhart, statutory deadlines for agency action do not imply that the power granted by statute and subject to that deadline "automatic[ally] . . . expir[es]" upon that date. 537 U.S. at 159 n.6 (cleaned up). This is true even if, as here, the deadline and the power granted by Congress -- here, the authority to promulgate rules without notice-and-comment -- "figur[e] in the same statutory section." Id. Thus, SBA had authority to promulgate the Corporate Group Rule without notice-and-comment and that authority did not "expir[e]" before the Rule was issued.

**D. SBA Correctly Applied the Corporate Group Rule to Soho Hotel**

Soho Hotel argues that, even if the Corporate Group Rule is valid, SBA acted unreasonably in applying it to Soho Hotel and in denying Soho Hotel's loan forgiveness application on that basis.

As relevant here, SBA's denial rested on its determination that Soho Hotel was part of a "single corporate group" that was majority-owned by Aby Rosen and Michael Fuchs, and that the corporate group had already received second-draw PPP loans in excess of SBA's $4 million limit when Soho Hotel applied for its loan. Soho Hotel therefore was not eligible for any additional disbursement and, for the same reason, was not eligible for forgiveness of the loan it did receive.

Soho Hotel challenges both SBA's interpretation of the Corporate Group Rule as reaching common ownership by "aggregated minority interests" and its determination that Soho Hotel was indeed part of a "single corporate group." Neither argument is persuasive.

Soho Hotel principally argues that SBA's interpretation of the Corporate Group Rule as reaching businesses majority-owned by any "individual, entity or combination thereof," including a "common parent" made up of "aggregated minority interests," is inconsistent with the text of the Rule, which, it maintains, reaches a much narrower set of common ownership structures. See SBA OHA Decision at 26. SBA counters that the plain language of the Rule encompasses ownership by a "common parent" of any kind, which can include joint ownership, and that the agency therefore correctly applied the Rule to Soho Hotel.

26

Regulations, like statutes, are interpreted by courts using "all the 'traditional tools' of construction." Kisor v. Wilkie, 588 U.S. 558, 574 (2019) (citation omitted). These include "the text, structure, history, and purpose of [the] regulation." Id. Only if a regulation is "genuinely ambiguous" does the court defer to the agency's reasonable reading of that regulation. Walsh v. Walmart, Inc., 49 F.4th 821, 827-28 (2d Cir. 2022) (quoting Kisor, 588 U.S. at 563). If there is no uncertainty, then the regulation "just means what it means[] and the court must give it effect, as [it] would any law." Id. (quoting Kisor, 588 U.S. at 575).

The Court, accordingly, "begin[s] [its] interpretation of the regulation with its text." Green v. Brennan, 578 U.S. 547, 553 (2016). The Corporate Group Rule defines a "corporate group" as including any business that is "majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. at 26,325. It does not further define the term "common parent." There is, however, nothing in the language of the Rule that purports to limit the type of entity (or entities) that can constitute a "parent," and the term itself is capacious enough to reach a variety of ownership structures, including joint ownership. See Forest View Rehab. & Nursing Ctr., 2024 WL 5247837, at *14 ("[T]he term 'common parent' . . . places no limit on the type of entity that can comprise a 'parent.'" (emphasis in original)). Nor is there anything additional in the Rule that purports to require specific types of ownership or any evidence of a connection between constituent

27

businesses apart from the existence of a common parent with a majority ownership interest in each business.

Soho Hotel nonetheless argues that the ordinary meaning of the regulation reaches only what it terms a "parent-subsidiary relationship," that is, a "collection" of "affiliated" companies that are all "controlled by a parent company, and often file one consolidated tax return." Pl.'s SMJ Mem. at 19-20. But Soho Hotel's attempts to bootstrap additional requirements into the regulation are unpersuasive and unsupported by the text of the Rule.

Soho Hotel first points to what it contends is the "common[] underst[anding]" of the phrase "corporate group," asserting that it carries the narrow meaning just described. But Soho Hotel's resort to the "common understanding" of the term (even assuming it is correct) is inappropriate where, as here, SBA expressly defined the phrase "corporate group" in the Rule. See 85 Fed. Reg. at 26,325 (defining "corporate group" to include any business "majority owned, directly or indirectly, by a common parent"); see also Van Buren v. United States, 593 U.S. 374, 387 (2021) (when the law explicitly defines a term, the court "must follow that definition, even if it varies from a term's ordinary meaning" (citation omitted)). In the face of this clear instruction from the agency about how to determine whether businesses constitute "a single corporate group," Soho Hotel's attempt to rewrite the Rule based on the use of the phrase "corporate group" in other contexts is misplaced. The Court -- and the agency -- are bound by the definition supplied in the Rule.

28

Indeed, Soho Hotel's proposed interpretation would deviate from the text of the Rule in several respects. First, Soho Hotel repeatedly suggests that filing a consolidated tax return is critical to being part of a "corporate group." See Pl.'s SMJ Mem. at 19-20; see also id. at 21 (arguing that Soho Hotel and the other LLCs identified "all file their own individual tax returns"). But there is nothing in the Rule that imposes such a requirement or that otherwise suggests that an analysis of a business's tax returns is either necessary or relevant to determining whether the Rule is satisfied.

Additionally, Soho Hotel argues that it and the other businesses identified by SBA cannot be part of a "single corporate group" because Soho Hotel is a "stand-alone limited liability company that has its own management and employees, both of which are entirely separate from the other limited liability companies" identified by SBA as being part of the same corporate group. The Rule, however, says nothing about shared employees, shared management, or other similar types of affiliation between constituent businesses. To the contrary, the Rule is clear that majority ownership is itself sufficient, whether the "common parent" owns the constituent companies "directly or indirectly." 85 Fed. Reg. at 26,325.

In addition to making arguments about the meaning of the term "corporate group," Soho Hotel also argues that the use of the phrase "common parent," read "in the context of the entire regulation" requires the same conclusion about the meaning of the Rule. Pl.'s SMJ Mem. at 19. Soho Hotel is right that, unlike the phrase "corporate

29

group," the regulation does not independently define the term "common parent." However, it does not follow from this that Soho Hotel's crabbed reading of the phrase is correct. For one, Soho Hotel relies on its purported definition of a "corporate group" to explain its interpretation of the phrase "common parent." See id. at 20 ("Because the term 'corporate group' is commonly understood to involve a parent-subsidiary relationship, the common sense meaning of the term 'common parent' is the entity that controls the affiliated group of companies, i.e., the subsidiaries."). But, for the reasons just described Soho Hotel's arguments about the meaning of the term "corporate group" are inconsistent with the text of the regulation. There is therefore no reason to read the phrase "common parent" in light of a definition of "corporate group" not adopted by the Rule.

Moreover, to the extent that Soho Hotel means independently to argue that the phrase "common parent" itself limits application of the Rule to so-called "parent-subsidiary relationship[s]," it points to nothing in the text of the Rule to support this conclusion. Soho Hotel highlights various definitions of the terms "parent company" and "parent corporation," but the regulation itself says nothing about parent companies, parent-subsidiary relationships, or any of the other factors that Soho Hotel suggests must be met for the Rule to apply. To the contrary, the Rule places no apparent restrictions on the type of entity or entities that can comprise a "parent," so long as the requirement of majority ownership is met.

The structure, history, and purpose of the regulation similarly support a broad reading of the term "common parent." SBA promulgated the Corporate Group Rule "[t]o preserve finite appropriations for PPP loans and [to] ensure broad access for eligible borrowers." 85 Fed. Reg. 26,325 n.1. The agency's aim of disbursing highly limited PPP funds to as many borrowers as possible is most consistent with a reading of the term "common parent" capacious enough to capture businesses with common ownership of various kinds. Put another way, cabining the term "common parent" to reach only corporations or only companies that file a single consolidated tax return would not, in any obvious way, help further SBA's aim of providing its limited funds to as many businesses as possible.

Moreover, other parts of the Rule support this conclusion. In clarifying any potential overlap between the Corporate Group Rule and SBA's affiliation rules, SBA explained that "[b]usinesses are subject to th[e] limitation [set forth in the Corporate Group Rule] even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act <u>or are otherwise not considered to be affiliates under SBA's affiliation rules</u>." <u>Id.</u> at 26,325 (emphasis added). The straightforward implication of this admonition is that a "corporate group" is, if anything, at least potentially broader than the set of businesses that would qualify as "affiliates" under the SBA's affiliation rules (and, at least, not significantly narrower). Affiliation itself is a "totality of the circumstances" determination that can be based on ownership (including joint ownership), among a

variety of other factors. See 13 C.F.R. § 121.103(a)(2), (a)(5), (c)-(h); see also, e.g., id. § 121.103(a)(c)(2) (aggregating minority ownership interests to determine affiliation). Therefore, regardless of the precise distinction between affiliation and a corporate group, it is implausible that the phrase "common parent" would render the definition of a corporate group so substantially narrower than SBA's treatment of affiliates. Accordingly, neither the text, nor the regulation's history, purpose, or structure, supports Soho Hotel's cramped interpretation of a "corporate group."

The Court acknowledges that the term "common parent" may leave some uncertainty about its outer limits. At most, then, the Rule is ambiguous as to whether a "common parent" can be made up of aggregated minority interests. To the extent the Rule is ambiguous, the Court defers to SBA's "reasonable" interpretation of the Rule. See Kisor, 588 U.S. at 575; see also Walsh, 49 F.4th at 829 (an agency's interpretation of its own rule "is entitled to substantial deference 'so long as it . . . sensibly conforms to the purpose and wording of the regulations'" (quoting Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991))).

As SBA emphasizes, the purpose of the Corporate Group Rule was to allocate limited PPP funds as broadly as possible. Making common ownership the touchstone of the Rule reasonably serves this end because a common parent can make financing decisions across the businesses it owns. Moreover, it was sensible for SBA to conclude that avoiding the concentration of funds within commonly owned businesses -- regardless

of the nature of the common ownership -- would advance its goal of disbursing as broadly as possible the economic benefit of the PPP funds. Conversely, excluding from the Rule's operation the joint owners of multiple businesses based on the absence of common management, joint tax returns, or a particular corporate form, would, without any obvious reason, allow such owners to benefit disproportionally from the Program. Taking these considerations into account, SBA's interpretation of the Rule is a reasonable one.[7]

To the extent that Soho Hotel separately challenges SBA's factual determination that Mr. Rosen and Mr. Fuchs, through their combined majority interests in at least six businesses, including Soho Hotel,

---

[7] Notably, when Soho Hotel initially submitted its second-draw PPP loan application, Mr. Rosen certified (untruthfully) that neither he nor Mr. Fuchs (each identified as 50 percent owners of Soho Hotel) owned any other businesses. See SBA OHA Decision at 23 (citing AR 3948). As a result, no Addendum A, listing all such businesses and their relationships, was included with the initial loan application. Id. It was therefore not until Soho Hotel applied for forgiveness of its second-draw PPP loan, and SBA sought additional information and tax documents, that Mr. Rosen submitted organization charts and other records demonstrating Mr. Rosen's and Mr. Fuchs's combined majority ownership of a number of other businesses, including five other businesses that had received second-draw PPP loans. Although Mr. Rosen's failure to truthfully disclose his and Mr. Fuchs's ownership interests in other businesses when initially applying for Soho Hotel's second-draw PPP loan is not directly probative of whether those other businesses constitute a "single corporate group," it does seriously undermine Soho Hotel's claim that is was unfairly surprised by SBA's application of the Corporate Group Rule to Soho Hotel upon its application for loan forgiveness. After all, Soho Hotel initially withheld the very information that would have enabled SBA to have promptly determined that it was part of a single corporate group which had already received $4 million in second-draw loans.

were the common parent to a corporate group consisting of those businesses, this challenge also fails.

An agency's findings must be upheld if supported by "substantial evidence." Labor Council for Latin Am. Advancement v. EPA, 12 F.4th 234, 244-45 (2d Cir. 2021). This requires "less than a preponderance but more than a scintilla of evidence." Id. at 245 (quoting Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 638 (2d Cir. 1999)). The "possibility of drawing two inconsistent conclusions from the evidence" does not mean that substantial evidence does not exist. Id. (quoting Corrosion Proof Fittings v. E.P.A., 947 F.2d 1201, 1213 (2d Cir. 1991)).

SBA's application of the Corporate Group Rule to Soho Hotel is supported by substantial evidence. In reaching its conclusion that Soho Hotel is part of a "corporate group" united by Mr. Rosen's and Mr. Fuchs's ownership, SBA reviewed thousands of pages of documentation, including the entities' tax returns, operating agreements, organization charts, and Soho Hotel's responses to SBA's inquiries. As SBA notes, those records demonstrated that, just among companies that had applied for and received second-draw PPP loans, Mr. Rosen and Mr. Fuchs wholly owned five companies (each by a 50-50 split), majority owned two additional companies (again, via an even split), and held a minority interest in each of two more companies. See SBA OHA Decision at 25; Supp. AR 829-31. This evidence of Mr. Rosen's and Mr. Fuchs's "frequently occurring business relationships," as well Soho Hotel's own characterization of Mr. Rosen and Mr. Fuchs

as "business partners," supports the agency's conclusion that Mr. Rosen and Mr. Fuchs, through their combined majority ownership of at least six businesses, operated as a "common parent" of a "single corporate group." See SBA OHA Decision at 9, 25-26; Supp. AR 828.

Soho Hotel does not engage with any of the evidence in the administrative record on which the agency relied in determining that Mr. Rosen and Mr. Fuchs operated as a "common parent." Soho Hotel does not dispute that Mr. Rosen and Mr. Fuchs each own 50 percent of Soho Hotel and that, together, they also have majority ownership of five other entities that received second-draw PPP loans. See Pl's SMJ Opp. at 10. Likewise, Soho Hotel does not dispute, as it conceded below, that Mr. Rosen and Mr. Fuchs are "business partners." Nor does it point to any evidence in the record that would tend to undermine the conclusion that Mr. Rosen and Mr. Fuchs had a recurring business relationship, which included their combined ownership of at least seven companies.[8]

Instead, Soho Hotel continues to focus on the absence of evidence in the record supporting measures of relatedness between Mr. Rosen's and Mr. Fuchs's companies that simply do not figure in the Corporate Group Rule. For example, Soho Hotel points out that there is no

---

[8] SBA, in its papers, characterizes the ALJ as having determined that Mr. Rosen and Mr. Fuchs operate as a partnership-in-fact. Soho Hotel disputes whether such a finding was made. The Court, however, finds it unnecessary to focus on the use of any particular label when the Rule itself does not use the term and where it is substantially clear from the record that the ALJ considered Mr. Rosen and Mr. Fuchs to be engaged in a recurring business relationship.

evidence in the record that the companies Mr. Rosen and Mr. Fuchs own are "interwoven together," such as by "sharing profits and losses, or some other reasonable measure." Pl.'s SMJ Opp. at 11. But, as discussed above, the only measure relevant to application of the Corporate Group Rule is majority ownership by a common parent. The presence (or absence) of any further overlap between such commonly owned companies is irrelevant. Nothing in the Rule requires companies in a corporate group to share profits and losses, or to otherwise be "interwoven."

For these reasons, Soho Hotel has failed to demonstrate that SBA's "common parent" finding is unsupported by substantial evidence in the record. SBA therefore did not violate the APA when it subjected Soho Hotel to the $4 million corporate group limit and denied its application for loan forgiveness on that basis.[9]

## IV.  Conclusion

For the foregoing reasons, the Court reconfirms its bottom-line order granting summary judgment to defendants and denying summary judgment to plaintiff. The Clerk of Court is respectfully directed to close the motions at docket numbers 15 and 18, to enter final judgment

---

[9] In a footnote, Soho Hotel makes a passing argument that SBA's denial of its loan forgiveness application was arbitrary and capricious because the agency did not explain why receiving a loan in excess of the $4 million Corporate Group Rule cap would have rendered its loan ineligible for forgiveness. But the Corporate Group Rule is express that any "PPP loan not in compliance with the limitation set forth in this rule . . . will be regarded as a use of PPP funds for unauthorized purposes, and the loan will not be eligible for forgiveness." 85 Fed. Reg. at 26,325. It is therefore abundantly clear from the record why the loan forgiveness application was denied.

in favor of defendants and dismissing the complaint with prejudice, and to close the case.

SO ORDERED.

New York, NY
July 2, 2026

_____
JED S. RAKOFF, U.S.D.J.